1  LAW OFFICES OF MILTON C. GRIMES
   Milton Grimes, Esq. (SBN 59437)
2  Claudia C. Bohorquez, Esq. (SBN 150647)
   3774 W. 54th Street
3  Los Angeles, CA 90043-2335
   Tel: (323) 295-3023
4
   Email:  miltgrim@aol.com
   Email:  cbohorquez@bohorquezlawgroup.com
5
   *Attorneys for Plaintiff*, NAREN HUNTER

6

7

8

9                     UNITED STATES DISTRICT COURT

                  FOR THE CENTRAL DISTRICT OF CALIFORNIA
10

11 | NAREN HUNTER, an individual, | Case No.:   2:22-CV-6981 |
   |---|---|
12 | Plaintiff, | COMPLAINT FOR DAMAGES FOR CIVIL RIGHTS VIOLATIONS.  42 U.S.C. §1983 |
13 | vs. | |
14 | FRANCIS X. HARDIMAN, an individual; MICHAEL HAGGERTY, an individual; SHERIFF ALEX VILLANUEVA, an individual; COUNTY OF LOS ANGELES, a government entity; and DOES 1-10, inclusive. | 1. Unlawful Search And Seizure 2. Substantive Due Process 3. Malicious Prosecution 4. Freedom Of Speech 5. Conspiracy To Violate Civil Rights 6. *Monell* Claim 7. Negligent Training and Supervision |
15 | | |
16 | | |
17 | Defendants. | DEMAND FOR JURY TRIAL |
18 | | |

19

20         Come now Plaintiff, NAREN HUNTER, and alleges as his complaint for violations of civil

21 rights against defendants FRANCIS X. HARDIMAN, MICHAEL HAGGERTY, SHERIFF ALEX

22 VILLANUEVA, and COUNTY OF LOS ANGELES, and DOES 1 through 10, inclusive, as follows:

23

24                                      1
                            COMPLAINT FOR DAMAGES

**INTRODUCTION**

These claims arise from the unlawful actions of law enforcement to interfere with Mr. HUNTER's constitutionally protected activities in rendering legal advice and otherwise practicing his profession which culminated in his traumatic arrest in the public courthouse and the illegal seizure of his legal files and cellphone all in violation his civil rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

**JURISDICTION AND VENUE**

1.      This Court has original jurisdiction pursuant to 28 U.S.C. §§1331 and 1343.  This is a civil rights action brought to redress alleged deprivations of constitutional rights arising under the laws of the United States, including 42 U.S.C. §1983, the Fourth and Fourteenth Amendments of the United States Constitution

2.      Venue is proper in this Court under 28 U.S.C. §1391(b) because a substantial part of the incidents, events, and occurrences giving rise to the present action occurred in this district.

**PARTIES**

3.      Plaintiff NAREN HUNTER is an individual and resident of the County of Humbolt, State of California.

4.      Defendant FRANCIS X. HARDIMAN ("HARDIMAN") is an individual and on information and belief resides in the County of Los Angeles, California.  At all relevant times herein, HARDIMAN was a deputy at the Los Angeles County Sheriff's Department ("LASD"), specifically a detective.  At all relevant times, HARDIMAN was employed by and working on behalf of the COUNTY OF LOS ANGELES and the LASD.  At all relevant times herein, HARDIMAN was acting under color of law within the course and scope of his duties as a detective for LASD.  HARDIMAN

1    was acting with the complete authority and/or ratification of his principals, defendants ALEX

2    VILLANUEVA and COUNTY OF LOS ANGELES.

3         5.     Defendant MICHAEL HAGGERTY ("HAGGERTY") is an individual and on

4    information and belief resides in the County of Los Angeles, California.  At all relevant times herein,

5    HAGGERTY was a deputy at the Los Angeles County Sheriff's Department ("LASD"), specifically a

6    detective.  At all relevant times, HAGGERTY was employed by and working on behalf of the

7    COUNTY OF LOS ANGELES and the LASD.  At all relevant times herein, HAGGERTY was acting

8    under color of law within the course and scope of his duties as a detective for LASD.  HAGGERTY

9    was acting with the complete authority and/or ratification of his principals, defendants ALEX

10   VILLANUEVA and COUNTY OF LOS ANGELES.

11        6.     Defendant ALEX VILLANUEVA ("VILLANUEVA") is, and was at all relevant

12   times herein, the Sheriff of the Los Angeles Sheriff's Department ("LASD"), and he, along with

13   DOES 7-10 were managerial, supervisorial, and/or policymaking employees of the LASD. At the

14   time of the incident VILLANUEVA and DOES 7-10 were acting under color of law within the course

15   and scope of their duties for the LASD.  VILLANUEVA and DOES 6-10 were acting with the

16   complete authority and ratification of their principal, COUNTY OF LOS ANGELES.

17        7.     Defendant COUNTY OF LOS ANGELES ("COUNTY") is a duly organized public

18   entity, existing under the laws of the State of California with the capacity to be sued. COUNTY is

19   responsible for the acts, omissions, policies, procedures, practices, and customs of its various agents

20   and agencies, including the LASD and its agents and employees. At all relevant times COUNTY was

21   responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of

22   LASD and its employees and agents complied with the laws of the United States and the State of

23   California.

24

3
COMPLAINT FOR DAMAGES

8.     The true names and capacities of DOES 1-10 are unknown to plaintiff, who otherwise sues these defendants by such fictitious names. Plaintiff will seek leave to amend this complaint to show the true names and capacities of these defendants when they have been ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct or liabilities alleged herein.  DOES 1-10 were at all relevant times herein employees for the COUNTY and reside in the County of Los Angeles, State of California.  At the time of the incident, DOES 1-10 were acting under color of law within the course and scope of their duties as employees for the COUNTY.  DOES 1-10 were acting with the complete authority and/or ratification of their principal, defendant COUNTY.  At all times mentioned herein, each and every separate defendant was the agent of each and every other defendant and had the legal duty to oversee and supervise the hiring, conduct, and employment of each and every defendant.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

9.     At all times relevant herein, Mr. HUNTER was a member in good standing of the California State Bar.  He had been practicing law for about 27 years, had never been arrested or jailed, and has no disciplinary issues on his State Bar record.

10.     Defendants HARDIMAN and HAGGERTY were LASD detectives investigating a murder which occurred in May, 2020.  In the course of their investigation, they learned that in March, 2020, one of their suspects was allegedly involved in a battery against a woman by the name of "Harris."  Harris had reported the crime to Los Angeles Police Department ("LAPD").

11.     On August 13,[1] Harris was arrested because she allegedly lied to police about what really happened in the March incident.  She was interviewed and stated that her minor daughter

---

[1] All dates herein are in the year 2020 unless otherwise indicated.

1   (Child 1 who was 10 years old) and her minor granddaughter (Child 2 who was 6 years old) were also

2   present during the March incident.[2]

3         12.     On August 17, Mr. HUNTER, working as a privately retained criminal defense

4   attorney, made an initial appearance at the arraignment and plea on behalf of Harris in department 12

5   of the Compton Courthouse of the Los Angeles Superior Court. Harris was present in court in custody

6   of the LASD. At that time, the matter was continued for further proceedings and arraignment and plea

7   to August 24.  Mr. HUNTER spoke to his client about her case, she was distraught about her arrest,

8   and there was no discussion about any children.

9         13.     On August 20, HARDIMAN and HAGGERTY arrested Harris' daughter "Holmes" on

10  a charge of PC 136.1 - witness dissuasion - because she allegedly failed to bring Child 1 and Child 2

11  children for an interview with the detectives a day earlier.  At this time, she stated that another minor,

12  Harris' grandson (Child 3 who is 5 years old), was present at the March incident.

13        14.     On August 24, Mr. HUNTER made his second appearance at the continued

14  proceedings for Harris in department 12 and additionally made an initial appearance on behalf of her

15  daughter Holmes in department 14 who was in custody of the LASD. Harris and Holmes were each

16  present in custody in lieu of bail. At that time, both matters were continued for further proceedings

17  and arraignment and plea to August 31.

18        15.     On August 24, Child 1 was interviewed through arrangements made with her father.

19  Mr. HUNTER had no knowledge of Child 1 in any respect at that time, and had no involvement in

20  arranging her interview.

21        16.     On August 31, Mr. HUNTER made his third appearance at the continued proceedings

22  on behalf of Harris and Holmes. Harris was not present due to apparent Covid-19 transportation

23  _____

24  [2] The names of the minors are omitted to protect their identities.

COMPLAINT FOR DAMAGES

1   related issues with the Los Angeles County jail system. Mr. HUNTER wanted an informal meeting

2   with prosecutors M. Ghobadi and J. Sargent in the respective Harris and Holmes cases regarding

3   discovery issues and other matters.  They went inside a jury room and were followed by

4   HARDIMAN and HAGGERTY who Mr. HUNTER had never met before and were introduced as

5   investigators in the cases.  While Mr. HUNTER, in his professional capacity as a defense attorney,

6   was attempting to negotiate various discovery matters with prosecutors on behalf of his clients,

7   HARDIMAN and HAGGERTY were secretly recording the meeting utilizing an inconspicuous

8   personal recording device, in blatant disregard of California Rules of Court and other laws against

9   recording inside a public courthouse without authorization.  Moreover, both HARDIMAN and

10   HAGGERTY interrupted the discussions between counsel to badger Mr. HUNTER about whether he

11   had told his clients not to produce the Child 2 and Child 3 for interviews.  Mr. HUNTER vehemently

12   denied he did any such thing.  HARDIMAN brazenly accused Mr. HUNTER of "witness

13   intimidation" and "dissuading witnesses and preventing them to come forward."

14          17.     Mr. HUNTER had a second meeting with the prosecutors on August 31 in the jury

15   room.  HARDIMAN and HAGGERTY wanted to be present again, but Mr. HUNTER refused to

16   allow them in because of their earlier over-the-top behavior.  At this meeting, Mr. HUNTER and the

17   prosecutors made arrangements for the children, Child 2 and Child 3, to be interviewed on September

18   4 under the appropriate conditions with therapists or individuals trained to interview minor children.

19          18.     On September 4, Mr. HUNTER received a call from prosecutor M. Ghobadi who

20   informed him the children were not going to be taken in for the scheduled interviews.  Mr. HUNTER

21   made it happen and Child 2 and Child 3 were brought in later that day by a family member.  The

22   children were taken into custody by the LA Dept. of Children and Family Services ("DCFS").

23

24

6

COMPLAINT FOR DAMAGES

19.     On September 10, Mr. HUNTER made his fourth and final appearance at the continued proceedings on behalf of Harris and Holmes.  Both clients still in custody were not present at the hearing due to transportation or Covid issues.  It was Mr. HUNTER's expectation that by now the children had been interviewed.  He expected he would meet with the prosecutors to discuss settlement of the cases, a reduction of their seven figure bail amounts, and other matters related to the cases.   Mr. HUNTER met with prosecutors M. Ghobadi and J. Sargent in the hallway of the courthouse.  HARDIMAN and HAGGERTY were also present secretly recording (again).  Mr. HUNTER discussed discovery issues and bringing in another attorney for Holmes to appear via telephone in case of a conflict for the hearing.  At this time, Mr. HUNTER also inquired if the children had been interviewed as arranged for September 4.  He was told Child 2 and Child 3 had not yet been interviewed but were in their custody at DCFS since that date.

20.     Eventually, Child 2 and Child 3 were interviewed on September 11 by Forensic Interview Specialists trained in interviewing minors.  HARDIMAN and HAGGERTY monitored the interviews via video.  It is uncertain why those interviews were not taken until September 11 when DCFS had the children in their custody since September 4.

21.     During the course of his brief representation of Harris and Holmes, Mr. HUNTER did learn that LASD wanted to interview Child 2 and Child 3. He did not know about Child 1 until later, but he had nothing to do with any arrangements for her interview.  At all times relevant herein, Mr. HUNTER was in direct communications with the deputy district attorneys assigned to the cases about the interviews of Child 2 and Child 3 and took timely and reasonable steps to coordinate those interviews.  He advised his clients that Child 2 and Child 3 should be interviewed at the appropriate time and place with therapists or people trained to interview children.

COMPLAINT FOR DAMAGES

22.     Motivated by an irrational hostility and vindictiveness, in spite of obtaining the children's interviews in a reasonable time and manner, HARDIMAN and HAGGERTY built a criminal case against Mr. HUNTER, Holmes, and Lawanda (a family friend), calling them co-conspirators in a scheme to "hide" or keep the children away from law enforcement for their interviews in connection with a criminal investigation.

23.     On September 24, 2020, HARDIMAN presented an arrest warrant affidavit under penalty of perjury to a judge and seeking an $800,000 bail amount against Mr. HUNTER.  The arrest warrant affidavit contained numerous intentionally false and misleading statements which were specifically proffered to convince the judge to issue a warrant for the arrest of Mr. HUNTER, including purported statements made by Mr. HUNTER and his clients about the children's interviews, out of context and paraphrased in quotes, some words in ALL CAPS to wildly mischaracterize their actual meaning, intention, and delivery.  He characterized Mr. HUNTER as the mastermind and initiator of the "corrupt agreement" to "hide" the children so they could not be interviewed by law enforcement, an outrageous accusation unsupported by fact.

24.     HARDIMAN and HAGGERTY knew the first time Mr. HUNTER had ever met Harris was on August 17 at her first arraignment hearing in the Compton Courthouse.  Yet in the search warrant affidavit HARDIMAN falsely stated that Mr. HUNTER had a previous relationship with Harris because he "represented her in a custody battle over her children" against her former partner.  Mr. HUNTER never met Harris prior to August 17 and never represented her prior to that day.   This was done to impute a non-existent familiarity between Mr. HUNTER and Harris that could lend itself to hatching a conspiracy to commit this crime, and thereby influence the judge to buy into the plausibility of their outlandish claim.

8

COMPLAINT FOR DAMAGES

25.     HARDIMAN's search warrant affidavit contained a "phone book" of evidence as he called it because it was more than 150 pages long.  While the criminal allegations against Mr. HUNTER stemmed from an alleged conspiracy over a 14-day period commencing August 17, HARDIMAN's affidavit was purposely misleading, spinning a tale that started in March and thereby making it seem as if the children had been hidden or prevented from being interviewed all that time.  Coupled with the false statement that Harris and Mr. HUNTER knew each other before August 17, it was the perfect set up.

26.     Failing to clearly set forth the "object" of the alleged conspiracy, HARDIMAN stated in his search warrant affidavit that "in a conspiracy as complex, and drawn out as this one, identifying the object of the conspiracy can be difficult."  He then absurdly concluded that the "object of the conspiracy is to aid…Harris in the felony of accessory [to a murder] in order that she should avoid or escape conviction, a felony violation of 32PC."  It is a preposterous accusation that Mr. HUNTER hatched this "conspiracy" on the very day he met Harris August 17, a day he did not even know of the existence of any children having to do with his client's case.  Ultimately, the children were interviewed by child interview specialists on August 24 and September 11.

27.     By mischaracterizations, falsehoods, and manipulating statements to support a false narrative, HARDIMAN convinced a judge to issue the arrest warrant against Mr. HUNTER, including a $1.3 million bail, on September 24.

**The Arrest, Booking, and Detention - September 28-29, 2020**

28.     On the morning of September 28, 2020, defendants HARDIMAN and HAGGERTY, accompanied by an army of 10 armed, uniformed LASD sheriff deputies, and two other plainclothes deputies, arrested Mr. HUNTER outside the door of the Compton Courthouse as he was on his way to

9

COMPLAINT FOR DAMAGES

1    make a court appearance for Holmes. Mr. HUNTER was immediately turned around and handcuffed.

2    His cellphone and his briefcase containing files including Holmes' were also seized.

3         29.    The arrest was tape recorded by defendant HARDIMAN.  Per the audio recording, Mr.

4    HUNTER asked HARDIMAN to call his wife.  HARDIMAN can be heard telling Mr. HUNTER's

5    wife "the charges are conspiracy and several counts of witness dissuasion.  So – so – Okie-doke?"

6    Mr. HUNTER also asked HARDIMAN during the arrest if there was a bail recommendation to which

7    he responded, "Yeah.  It's 1.3 million dollars."  Mr. HUNTER responded, "For my bail?"

8         30.    Mr. HUNTER was shocked and confused by his arrest and the enormous bail amount.

9         31.    Mr. HUNTER was transported to Century Regional Detention Facility (aka CRDF) in

10   Lynwood, CA for booking.  At CRDF, Mr. HUNTER was fingerprinted and mugshots were taken.

11   He was issued a "Yellow" wristband with a booking number and bail amount printed on it.  On

12   information and belief, "Yellow" booking wristbands are typically used to distinguish a homosexual

13   or Penal Code 288 child molester.

14        32.    Mr. HUNTER was read his Miranda Rights and questioned by defendants

15   HARDIMAN and HAGGERTY.

16        33.    Mr. HUNTER was held at CRDF until he was transported by bus to the Los Angeles

17   County Inmate Reception Center ("IRC") in downtown Los Angeles later that afternoon.  At IRC,

18   Mr. HUNTER was subjected to cruel and unusually inhumane and horrific conditions including but

19   not limited to potential exposure to Covid-19 (this was the height of the Covid pandemic before

20   vaccines were available), lack of soap and running water, lack of access to drinking water, in addition

21   to potential threats from detainees and jail guards.

22

23

24

COMPLAINT FOR DAMAGES

34.     Mr. HUNTER arrived at the IRC around 5 or 6 p.m.[3] and placed into a cell with dozens of other detainees.  He was required to remove his clothes and visually inspected.  He was taken to a shower area with dozens of other people.  He received jail-issued clothes.  They were locked in the shower area for at least 1 ½ hours.

35.     Between 10 p.m. or midnight, from the shower area, Mr. HUNTER was taken to an area where hundreds of detainees were standing in a series of lines.  He received a Covid nasal test and his blood pressure was checked.  It was extremely high.  He was taken for a medical screening.  Thereafter, he was taken to a TV room with about 100 other detainees where he continued to wait with nowhere to sleep or lay down.  There were drug addicts and mentally ill chained to chairs defecating on themselves.  Detainees were sleeping on the floors, yelling, complaining about the conditions, and fighting with deputies.

36.     At some point, a deputy told Mr. HUNTER that his bail had been posted, but still could not be released.  Thereafter, medical staff told him that because of his high blood pressure reading, they could not release him at that time.  By this time, it was after midnight.  Mr. HUNTER explained that he had a private doctor who could take care of him.  He declined medical treatment at the IRC, but they refused to release him.

37.     Around 2 a.m., Mr. HUNTER was taken out of the TV room and placed in a dark, unlit room with dozens of other detainees.  The detainees started complaining about the conditions and it started to get crazy in the room.  A deputy took Mr. HUNTER out of the room and put him back in the TV room with two or three other people.

_____

[3] The times are approximate as Mr. HUNTER did not have a cellphone, watch, and no clocks that he noticed at IRC.

COMPLAINT FOR DAMAGES

38. By sunrise, September 29, Mr. HUNTER was given back his own clothes and he got dressed. He was informed that an ambulance would transport him to the Los Angeles County USC Hospital because of his blood pressure. Before he could leave, a deputy told him to pull his pants and underwear halfway down again to do a visual search. Mr. HUNTER was placed on a gurney and transported in an ambulance to the hospital. Upon his arrival, he was passed off to hospital staff still on a gurney and taken to an ER waiting area. ER doctors examined him and he was discharged around 10 a.m.

39. By the time of his release from the hospital, Mr. HUNTER's briefcase had been returned to his brother with contents missing and no inventory provided. In particular, Holmes' file was missing. In addition, HARDIMAN had refused to return Mr. HUNTER's cellphone. To date, the cellphone has not been returned and a motion is pending in state court in that regard.

40. Mr. HUNTER's cellphone contains specific evidence directly contradicting statements made by HARDIMAN in his arrest warrant affidavit.

### The Interrogation September 28 by HARDIMAN/HAGGERTY

41. The charges alleged in defendant HARDIMAN's arrest warrant affidavit were described as follows: "The information gathered during the investigation establishes the commission of the following criminal offense(s): Penal Code §182/32 and PC §136.1(c)(2) by the following person: HUNTER, NAREN MALCOLM." (Conspiracy/Accessory to a crime; Witness Dissuasion). On the basis of HARDIMAN's affidavit, an arrest warrant was issued by Judge Ricardo Ocampo on September 24, 2020.

42. On the day of his arrest, HARDIMAN and HAGGERTY interrogated Mr. HUNTER at the Century Station. The interrogation was tape recorded by the defendants. He was read his Miranda Rights. The following are excerpts from the interrogation:

12

COMPLAINT FOR DAMAGES

**Hardiman:** "Well, we want to talk to you about why you've been arrested.  You don't have to talk to us if you don't want to…. We obtained an arrest warrant for your arrest…. We gathered a whole bunch of information from a bunch of different sources including you…. We brought it to Rick Ocampo at Compton…. And you know my computation of the bail is $800,000.  He disagreed with my calculation and made it 1.3 million."

**Hardiman:** "Do you want to talk to us about this?
**Hunter:** Not at this time."

**Hardiman:** "Okay.  Okay.  I mean you'll eventually see the evidence.  There's quite a bit.  I'm pretty sure you know what you did.
**Hunter:**  Pretty sure what?
**Hardiman:**  I said I'm pretty sure you know what you did.
**Hunter:**  What I did?
**Hardiman:**  Yes.
**Hunter:**  Okay.
**Hardiman:**  So this isn't personal.  This is, this is all business.  You know, we're in the truth and justice business."

Suggesting Mr. HUNTER will likely be disbarred like other attorneys they have arrested.

**Hunter:** "I'm screwed.  My career is over.  This gets transmitted to the bar.  I'm done.
**Hardiman:**  Well, it's getting transmitted to the bar…. I mean, it's about justice.  And…you know as citizens of a county have all agreed on a way to live and that way to live is the law.  And someone like you knows that better than anyone else.  Without the law we have anarchy.  And that law applies to everyone.  We are a nation of laws and not of men.
**Hunter:**  Interesting.
**Hardiman:**  We are.  And without the law it's who's got the most guns or who's the biggest guy.  Me and him would survive in a world like that.
**Hunter:**  I know you guys would.
**Hardiman:**  Okay.  Well, I survived, it turns out I survived in both worlds…. I prefer the world of the law…. And that law applies to lawyers just like it applies to policemen.…I mean just so you know, you're not the first lawyer I've arrested.  Hopefully, you're the last.  The other two lawyers that I arrested got indicted by the grand jury.  One of them is still sitting in jail.  The other is awaiting trial.  He almost certainly will be convicted.  Both of those guys interfered in murder cases just like in this instance.  Both of these guys will probably end up being disbarred…."

**Hardiman:**  "… This arrest is going to impact your life significantly.  It should…. [T]he other lawyers that I arrested they all interfered in murder investigations too.  And they shouldn't have done and they knew they shouldn't have done it.  And you know, my belief is that you did the same."

Accusing Mr. HUNTER of instructing his clients to break the law, and that his clients said so, and after their arrests for this alleged conspiracy they are now protecting him.

COMPLAINT FOR DAMAGES

1

2   **Haggerty:** "That's the worst part, I think…. to hire somebody that they thought was going to give them accurate legal advice.  That told them – they start to then break the law.
    **Hunter:**  Well, I never instructed anybody to break the law."

3

4   **Hardiman:  "**You know I think this is an opportunity for you to … tell us what happened…. We have a great deal of evidence about your interactions with [Harris], [Holmes], Lawanda, Janet, a whole bunch of these people and the directions you gave

5   them.
    **Hunter:**  That's crazy.

6   **Hardiman:**  Quite honestly when I heard all the evidence and this behavior, I agree, it's crazy. You shouldn't have done any of that.  It's crazy.

7   **Hunter:**  At no time did I ever tell any of these people to hide those children.  Those words never came out of my mouth.  At best, anything I ever said was there's an appropriate time

8   and manner for these interviews to take place.  Let's make sure that that happens appropriately.  That was it.  I don't even know how this gets misconstrued of me telling

9   anybody to go take some kids.  I've never even seen the kids before.  The first day I came to court with [Harris] was when all those ladies were out there.  And I said, hey, you know,

10  they want to interview these kids.  And it's got to be done in appropriate time and manner. That was it.  I'm still at a loss how it gets spun into something else…. Of course there's

11  witnesses out there that need to be interviewed appropriately.  In appropriate manner, child witnesses are interviewed in an (inaudible) manner.  That's all that is… It was real simple.

12  These interviews need to take place in an appropriate time and manner.
    **Hardiman:**  Okay.  And so if we ask people, hey we want to interview these people, right.

13  And other people know about that.  And they agree.  They say, yeah, sure.  And then somebody intervenes and says, oh, there's an appropriate time and place and that isn't it.

14  Right.  I mean, there's an argument to be made there, that's dissuading a witness."
    **Hunter:**  It's not.  It's real, real simple.  Who or where are these kids, their mother—

15  they're going to be interviewed.  You guys can make sure that this interview takes place. We'll make sure there's an appropriate time for it to take place.  I'm still at a loss.  I'm

16  really not understanding.
    **Hardiman:**  …The only time anybody ever said about there's an appropriate time to

17  interview people and stuff like that is after they've been arrested.  They're actually trying to defend you in a way after they got arrested."

18

19  **Hunter:**  "…There's no way in the world that I would sit up there and tell some people to hide some witnesses, let alone some kids in connection with a case.  That just didn't

20  happen.  So, I understand that's what this file is about.  I have to deal with it.  And hey, my nightmare begins."

21  The lengths HARDIMAN and HAGGERTY went to in order to obtain an arrest warrant.

22  **Hardiman:** "I'm a pretty careful guy.  I'm not just going to go out and 836 arrest a lawyer… I brought [JUDGE] Rick Ocampo a phone book.  Hey, here you go.  You decide.

23  **Hunter:** Uh-huh.

24  _____
                        14
    COMPLAINT FOR DAMAGES

**Hardiman:** I mean, essentially the entirety of, you know, what transpired between 3/12/20 and... 9/24/20, when I walked into… his chambers is contained in that… notebook or phone book.  It was a lot…the warrant is 74 pages plus another eight.

**Hunter:**  My warrant was 74 pages?

**Hardiman:**  Uh-huh.

**Hunter:**  Jesus Christ.

**Hardiman:**  Plus like 80 pages of attachments.

**Hunter:**  Uh-huh.

**Hardiman:**  It's like 150 page.  It was big.  And that's not even like…it's not like there was transcripts of phone calls or anything.… In the end it's going to be much larger than that."

**Hardiman:**  "… in this system and I think it's unfair, quite honestly, to bring evidence in Los Angeles County against a lawyer.  You don't need a mountain of evidence, you need like Mount Everest, Annapurna, you know…"

The insane suggestion Mr. HUNTER wanted to represent all of his alleged co-conspirators to protect his own actions in the alleged conspiracy.

**Hunter:**  "Did Brianna say that she hired me?

**Hardiman:**  We heard them talk on the phone saying she was going to hire you and that she had money to give you.  I mean that's just a …side note… there's legal…issues involved in this….I mean criminal legal issues involved and then…ethical issues…that make us raise our eyebrows…. You know when…[Harris], [Holmes], Brianna all three of them are… engaged in a conspiracy…. Two of them charged with a conspiracy…. And one person seeks to represent them all…. You know…from your position as a lawyer…you know what a conflict is."

HARDIMAN's wish list that Mr. HUNTER be convicted of a felony and be disbarred.

**Hardiman:** I think you should get a conviction for 136.1, witness dissuasion.

**Hunter:**  Uh-huh.

**Hardiman:**  "if it was me, I would say the DA's office he should get a felony conviction and be able to work it down to a misdemeanor.

**Hunter:**  Uh-huh

**Hardiman:**  And you should be disbarred.

**Hunter:**  Uh-huh

**Hardiman:** That's what I think should happen."

The accusation that Mr. HUNTER instructed clients to "hide" kids from HARDIMAN and HAGGERTY and that they had mountains of evidence of it.

**Hunter:** "Did the kids ever get interviewed?

**Hardiman:**  Yes.  And I think that's one of the significant disadvantages that you're going to have in this case.  Because your efforts to and you don't need to agree with that part… but our contention is that you engaged in efforts to hide those children from us and to

15

COMPLAINT FOR DAMAGES

1   prevent us from being able to talk to them…. And this could have gone in such a
    completely differently direction than it should have.

2   **Hunter:** Was it not the case that when I was there that first day we were to have an
    interview?

3   **Hardiman:** On 8/17/20?
    **Hunter:** The day that I came in and we were in the jury room.

4   **Hardiman:** Oh that was 8/31/20. That was 14 days after the conspiracy to hide these kids
    began. We had already arrested Shadrona and got in a fight with her…cause she was

5   hiding the kids based on what you told her to do.
    **Hunter:** Based on what I told her to do?

6   **Hardiman:** Yes.
    **Haggerty:** 'Cause we had scheduled a forensic interview before that…on 8/14 we

7   scheduled an interview for 8/19.
    **Hunter:** You guys have the psychologist and everybody like that?

8   **Hardiman:** Uh-huh. Yeah.
    **Haggerty:** And then we went and talked to her in front of her apartment. And that's what

9   she…
    **Hardiman:** Explained to us…. My lawyer told me not to bring them to you.

10  **Hunter:** Interesting.
    **Hardiman:** And you'll see. It's not just that. It's not just her. There's a ton of evidence

11  that you engaged in this conspiracy, a ton.

12  Scaring Mr. HUNTER and suggesting that he should seek protection at IRC.

13  **Hardiman:** So from here you'll go to I.R.C….. I strongly suggest you tell them you're a
    criminal defense attorney and you've represented people that are in this building.

14  **Hunter:** Okay.
    **Hardiman:** You know and then they…classify you based on those kinds of things and

15  they put you in housing based on that.

16      43.    At all times relevant herein, LASD ran a so-called "listening" program wherein

17  deputies conducted "Operations" where teams of technicians secretly set up microphones or other

18  listening devices in areas of the public courthouse to listen to inmates' conversations. At the

19  Compton courthouse, such devices were set up in a hallway next to the inmate holding area and the

20  attorney/client meeting room where conversations from both areas could potentially be picked up.

21  This was often regularly done without a court order, court authorization or permission, as required by

22  express Court rules and Orders, and LASD Court Services Division Manual 2-08/020.05.

23

24
                                        16
                          COMPLAINT FOR DAMAGES

44.     HARDIMAN admitted at court proceedings in August 2021, under oath, that he regularly conducted these secret Operations without authorization at the public courthouse as was the custom and practice of the LASD, and further admitted he ignored the rules and Court orders prohibiting it.

45.     Mr. HUNTER's reputation and ability to exercise his profession were affected by the actions of these defendants.  In or about February 2021, Mr. HUNTER was making a telephonic appearance for a client in a Norwalk courtroom.  His client was in the courtroom and later reported to Mr. HUNTER that before the case was called, he overheard court staff say, in reference to the client, "he has the attorney who got arrested" or words to that effect.

46.     In or about February and March 2021, in the same Norwalk courtroom, Mr. HUNTER had several hearings for another client where the judge tried to convince Mr. HUNTER to recuse himself from the representation of his client given the criminal investigation against him.  The judge went so far as to cite a case purportedly requiring Mr. HUNTER to recuse himself.  After reading the case, Mr. HUNTER pointed out that case involved an attorney who had been indicted.  No charges were filed against Mr. HUNTER and the client still wanted him to be his attorney.  The judge then required the client to sign a conflict waiver.

47.     Mr. HUNTER believes word traveled around the courthouses where he practiced and in legal circles that he was under criminal investigation which affected his professional reputation.

48.     Mr. HUNTER's arrest chilled his enthusiasm of stepping into court and his zealous advocacy in his criminal cases.  He developed a fear of being arrested. He feared going to the courthouse.  He lost his confidence and his foundation of being an attorney able to question policemen and defend his clients to his full potential.

COMPLAINT FOR DAMAGES

49.     Mr. HUNTER was required to hire an attorney commencing October 2020 to deal with the criminal case and the return of his cellphone.

50.     At a hearing on October 21, the $1.3 million bond was exonerated as no charges were filed against Mr. HUNTER.

51.     In February 2021 Mr. HUNTER received notice for the first time that an Order for a Special Master and a Search Warrant for his cellphone had been issued October 2, 2020 by Judge Ricardo Ocampo.

52.     As a result of Plaintiff's involuntary stay at the Los Angeles County USC Hospital, Mr. HUNTER incurred medical bills in excess of $5,000.00.

53.     From on or about September 30, 2020, through August, 2021, as a direct and proximate result of the injurious acts inflicted upon Mr. HUNTER by the defendants, he received psychological counseling, therapy, and support incurring further medical bills in excess of $6,000.00

54.     To date, no criminal proceedings or charges have been instituted or filed against Mr. HUNTER by any prosecutorial agency.

## FIRST CAUSE OF ACTION

**Violation of Civil Rights 42 U.S.C §1983 – Unreasonable Search and Seizure – Arrest Without Probable Cause/False Imprisonment**
**Fourth Amendment**

**(Against HARDIMAN, HAGGERTY and DOES 1- 5)**

55.     The allegations contained in paragraphs 1-53 are incorporated herein by reference as if set forth here in full.

56.     42 U.S.C. §1983 creates a private cause of action against individuals who, acting under color of state law, violate federal or statutory rights.

COMPLAINT FOR DAMAGES

57.     HARDIMAN's and HAGGERTY's actions constituted deprivations of Mr. HUNTER's personal liberty and rights against unreasonable searches and seizures in violation of the Fourth Amendment.

58.     HARDIMAN and HAGGERTY executed a hostile, irrational, and aggressive operation wherein they sought to build a criminal case against a member of the defense bar for "conspiracy" and "witness dissuasion" for the simple reason they wanted to interview three child witnesses in search of evidence for a criminal investigation, and felt Mr. HUNTER was putting obstacles in the way of that objective.

59.     In fact, Mr. HUNTER helped them to accomplish their objective in a timely and reasonable manner. He entered the picture Monday August 17.  He and the prosecutors made arrangements on Monday August 31 to bring Child 2 and Child 3 for their interviews at the agreed location on Friday September 4.  Scarcely 14 days transpired between August 17 and August 31. During this time, Mr. HUNTER was communicating directly with the prosecutors to make the interviews happen in a manner and time that was appropriate for the minor children.

60.     By September 4, Child 2 and Child 3 were in DCFS custody per arrangements by Mr. HUNTER and they were subsequently interviewed on September 11.  Child 1 had already been interviewed on August 24.  Mr. HUNTER did not have any participation in Child 1's interview arrangements.

61.     Despite accomplishment of the objective, defendants continued their aggressive investigation of Mr. HUNTER *after* the children had all been interviewed in a timely manner despite the fact they knew or should have known he was innocent of the charge of trying to "hide" them or "prevent them from being interviewed" by law enforcement.

19
COMPLAINT FOR DAMAGES

62.     Defendants were motivated by bad faith in that they had a preference toward getting Mr. HUNTER charged and found guilty of a crime which never happened, and their conduct was done with deliberate indifference to and/or reckless disregard of Plaintiff's rights and the truth.

63.     At worst, Mr. HUNTER was advising his clients that the children should be interviewed in an appropriate setting by people qualified to interview children, not that they should "hide" the children or never let them be interviewed by law enforcement.

64.     HARDIMAN and HAGGERTY took a normal set of circumstances over a reasonable time, that is, to arrange for the proper interview of these minor children, and spun it into an outlandish tale of a "complex," "drawn out" criminal conspiracy between attorney and clients to save Harris from a conviction for accessory to murder; and in doing so convinced a judge to issue a criminal arrest warrant against Mr. HUNTER with a seven-figure bail amount without probable cause.

65.     When Defendants caused Mr. HUNTER to be arrested on September 28, 2020, without probable cause, they violated his right to be secure in his person against unreasonable searches and seizures as guaranteed to him under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.  At all times herein mentioned, HARDIMAN and HAGGERTY acted for the purpose of depriving Mr. HUNTER of these constitutional rights.

66.     Defendants caused, allowed, consented to, and/or personally participated in the events which led to the unlawful search and seizure of Mr. HUNTER's person and property and are jointly and severally liable for the damages caused to him.

67.     Defendant COUNTY is vicariously liable for the wrongful acts of HARDIMAN and HAGGERTY pursuant to section 815.2(a) of the California Gov't. Code which provides that a public

COMPLAINT FOR DAMAGES

1  entity is liable for the injuries caused by its employees within the scope of employment if the

2  employee's act would subject him or her to liability.

3       68.     As a direct and proximate result of the aforesaid acts and omissions by defendants

4  HARDIMAN, HAGGERTY and DOES 1-5, Mr. HUNTER experienced great pain and suffering,

5  including emotional distress, shock, worry, humiliation, anguish, fright, confusion, anxiety,

6  nervousness, loss of enjoyment of life, inconvenience, embarrassment, apprehension, harm to

7  reputation, and other non-economic losses.  He also experienced loss of income and earning capacity

8  due to the effect the trauma of this ordeal had on his ability to perform in his profession as a zealous

9  advocate for his clients.  He incurred medical bills.  He was required to retain criminal defense

10  counsel at great expense and post a seven-figure bond.

11       69.     Exemplary and punitive damages are requested and warranted under 42 U.S.C. §1983

12  against HARDIMAN and HAGGERTY in their personal capacities because their conduct was

13  callous, willful, wanton, malicious, oppressive, and motivated by evil motive or intent or involved

14  reckless or conscious disregard for the federally protected rights of Mr. HUNTER and constitute the

15  type of despicable conduct that no civilized society should be forced to endure.  *Smith v. Wade,* 461

16  U.S. 30 (1983).

17       70.     By reason of the foregoing allegations, Plaintiff was required to retain counsel to

18  institute and prosecute this action and is entitled to a reasonable sum for attorney's fees pursuant to

19  42 U.S.C. §1988.

20

21

22

23

24

COMPLAINT FOR DAMAGES

## SECOND CAUSE OF ACTION

**Violation of Civil Rights 42 U.S.C §1983 – Substantive Due Process
Fourteenth Amendment**

**(Against HARDIMAN, HAGGERTY and DOES 1- 5)**

71.     The allegations contained in paragraphs 1-53 and 56-60 are incorporated herein by reference as if set forth here in full.

72.     42 U.S.C. §1983 creates a private cause of action against individuals who, acting under color of state law, violate federal or statutory rights.

73.     Defendants' actions constituted deprivations of Mr. HUNTER's rights to life, liberty, or property without due process of law in violation of the Fourteenth Amendment as applied to state's actions.  It is clearly established that there exists a constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. *Devereaux v. Abbey*, 263 F.3d 1070, 1074-1075 (9th Cir. 2001).  In doing the acts herein alleged, HARDIMAN and HAGGERTY acted maliciously and with the intent to deprive Mr. HUNTER of his constitutional right to pursue an occupation.  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069 (9th Cir. 2004).

74.     At all times herein mentioned, HARDIMAN and HAGGERTY acted for the purpose of depriving Mr. HUNTER of his specific constitutional rights under the Fourteenth Amendment not to be deprived of his substantive due process rights of life, liberty, or property without due process of law.

75.     Defendants caused, allowed, consented to, and/or personally participated in the events which led to Mr. HUNTER's unlawful arrest and the consequences thereof and are jointly and severally liable for the damages caused to him.

76.     Defendant COUNTY is vicariously liable for the wrongful acts of HARDIMAN and HAGGERTY pursuant to section 815.2(a) of the California Gov't. Code which provides that a public entity is liable for the injuries caused by its employees within the scope of employment if the employee's act would subject him or her to liability.

77.     As a direct and proximate result of the aforesaid acts and omissions by defendants HARDIMAN, HAGGERTY and DOES 1-5, Mr. HUNTER experienced great pain and suffering, including emotional distress, shock, worry, humiliation, anguish, fright, confusion, anxiety, nervousness, loss of enjoyment of life, inconvenience, embarrassment, apprehension, harm to reputation, and other non-economic losses.  He also experienced loss of income and earning capacity due to the effect the trauma of this ordeal had on his ability to perform in his profession as a zealous advocate for his clients.  He incurred medical bills.  He was required to retain criminal defense counsel at great expense and post a seven-figure bond.

78.     Exemplary and punitive damages are requested and warranted under 42 U.S.C. §1983 against HARDIMAN and HAGGERTY in their personal capacities because their conduct was callous, willful, wanton, malicious, oppressive, and motivated by evil motive or intent or involved reckless or conscious disregard for the federally protected rights of Mr. HUNTER and constitute the type of despicable conduct that no civilized society should be forced to endure.  *Smith v. Wade,* 461 U.S. 30 (1983).

79.     By reason of the foregoing allegations, Plaintiff was required to retain counsel to institute and prosecute this action and is entitled to a reasonable sum for attorney's fees pursuant to 42 U.S.C. §1988.

**THIRD CAUSE OF ACTION**

**Violation of Civil Rights 42 USC §1983 – Malicious Prosecution**
**(California Common Law and Fourth, Fourteenth Amendment)**

**(Against HARDIMAN, HAGGERTY, and DOES 1-5)**

80.     The allegations contained in paragraphs 1-53 and 56-60 are incorporated herein by reference.

81.     42 U.S.C. §1983 creates a private cause of action against individuals who, acting under color of state law, violate federal or statutory rights.

82.     A malicious prosecution claim under §1983 may be brought on the grounds of Fourth Amendment violations and due process under the Fourteenth Amendment.  Malicious prosecution with the intent to subject a person to denial of constitutional rights is also cognizable under §1983. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069 (9th Cir. 2004).  The relevant elements of the California common law tort of malicious prosecution are incorporated into an analysis under §1983. *Id.* at 1066.

83.     Malicious prosecution actions are not limited to suits against prosecutors but may be brought against other persons who have wrongfully caused the charges to be filed.  *Awabdy* at 1066.

84.     The prior criminal proceedings against Mr. HUNTER terminated in such a manner as to indicate his innocence and is indicative of a favorable termination.  *Awabdy* at 1068.  No charges were filed and his bond was exonerated October 21, 2020.  This could be because the prosecutor had doubts about the legitimacy of the charge or as to Mr. HUNTER's guilt.

85.     HARDIMAN and HAGGERTY pursued an unfounded criminal case against Mr. HUNTER.  They took a reasonable set of circumstances over a reasonable time to arrange for the proper interview of minor children, and spun it into an outlandish tale of a "complex," "drawn out" criminal conspiracy between attorney and clients to save Harris from a conviction for accessory to

24
COMPLAINT FOR DAMAGES

1   murder; and in doing so obtained a criminal arrest warrant against Mr. HUNTER with a seven-figure

2   bail amount without probable cause.

3        86.     At all times herein mentioned, HARDIMAN and HAGGERTY acted with malice and

4   without probable cause and did so for the purpose of denying Mr. HUNTER of his constitutional

5   rights to life, liberty, property, and to exercise his occupation.

6        87.     The criminal proceedings against Mr. HUNTER initiated by HARDIMAN and

7   HAGGERTY were undertaken in bad faith on the basis of their intentional and knowingly false

8   accusations, vindictiveness, and other malicious conduct.

9        88.     Defendants caused, allowed, consented to, and/or personally participated in the events

10  which led to the unlawful search and seizure of Mr. HUNTER's person and property and are jointly

11  and severally liable for the damages caused to him.

12       89.     Defendant COUNTY is vicariously liable for the wrongful acts of HARDIMAN and

13  HAGGERTY pursuant to section 815.2(a) of the California Gov't. Code which provides that a public

14  entity is liable for the injuries caused by its employees within the scope of employment if the

15  employee's act would subject him or her to liability.

16       90.     As a direct and proximate result of the aforesaid acts and omissions by defendants

17  HARDIMAN, HAGGERTY and DOES 1-5, Mr. HUNTER experienced great pain and suffering,

18  including emotional distress, shock, worry, humiliation, anguish, fright, confusion, anxiety,

19  nervousness, loss of enjoyment of life, inconvenience, embarrassment, apprehension, harm to

20  reputation, and other non-economic losses.  He also experienced loss of income and earning capacity

21  due to the effect the trauma of this ordeal had on his ability to perform in his profession as a zealous

22  advocate for his clients.  He incurred medical bills.  He was required to retain criminal defense

23  counsel at great expense and post a seven-figure bond.

24

25

COMPLAINT FOR DAMAGES

91.     Exemplary and punitive damages are requested and warranted under 42 U.S.C. §1983 against HARDIMAN and HAGGERTY in their personal capacities because their conduct was callous, willful, wanton, malicious, oppressive, and motivated by evil motive or intent or involved reckless or conscious disregard for the federally protected rights of Mr. HUNTER and constitute the type of despicable conduct that no civilized society should be forced to endure. *Smith v. Wade,* 461 U.S. 30 (1983).

92.     By reason of the foregoing allegations, Plaintiff was required to retain counsel to institute and prosecute this action and, by reason thereof, requests and is entitled to a reasonable sum for attorney's fees pursuant to 42 U.S.C. §1988.

## FOURTH CAUSE OF ACTION

### Violation of Civil Rights 42 U.S.C §1983 – Freedom of Speech
### First Amendment

### (Against HARDIMAN, HAGGERTY, and DOES 1- 5)

93.     The allegations contained in paragraphs 1-53 and 56-60 are incorporated herein by reference as if set forth here in full.

94.     42 U.S.C. §1983 creates a private cause of action against individuals who, acting under color of state law, violate federal or statutory rights.

95.     Defendants' actions violated Mr. HUNTER's right to freedom of speech as protected by the First Amendment by unlawfully interfering with his right to advise and be a zealous advocate for his clients.

96.     HARDIMAN and HAGGERTY knowingly made false accusations and engaged in other wrongful, concerted conduct that resulted in the institution of an unfounded criminal charge, and substantially infringed his First Amendment rights.  Defendants knew Mr. HUNTER had an appearance on September 28 for his client Holmes and arrested him as he approached the courtroom

1  that morning, leaving Holmes without an attorney for the hearing.  Mr. HUNTER never again

2  represented Harris or Holmes.

3      97.     At all times herein mentioned, HARDIMAN and HAGGERTY acted with the purpose

4  of depriving Mr. HUNTER of his specific constitutional right under the First Amendment not to be

5  deprived of his freedom of speech.

6      98.     Defendants caused, allowed, consented to, and/or personally participated in the events

7  which led to Mr. HUNTER's unlawful arrest and the consequences thereof and as such are jointly and

8  severally liable for the damages caused to him.

9      99.     Defendant COUNTY is vicariously liable for the wrongful acts of HARDIMAN and

10 HAGGERTY pursuant to section 815.2(a) of the California Gov't. Code which provides that a public

11 entity is liable for the injuries caused by its employees within the scope of employment if the

12 employee's act would subject him or her to liability.

13     100.    As a direct and proximate result of the aforesaid acts and omissions by defendants

14 HARDIMAN, HAGGERTY and DOES 1-5, Mr. HUNTER experienced great pain and suffering,

15 including emotional distress, shock, worry, humiliation, anguish, fright, confusion, anxiety,

16 nervousness, loss of enjoyment of life, inconvenience, embarrassment, apprehension, harm to

17 reputation, and other non-economic losses.  He also experienced loss of income and earning capacity

18 due to the effect the trauma of this ordeal had on his ability to perform in his profession as a zealous

19 advocate for his clients.  He incurred medical bills.  He was required to retain criminal defense

20 counsel at great expense and post a seven-figure bond.

21     101.    Exemplary and punitive damages are requested and warranted under 42 U.S.C. §1983

22 against HARDIMAN and HAGGERTY in their personal capacities because their conduct was

23 callous, willful, wanton, malicious, oppressive, and motivated by evil motive or intent or involved

24

27

COMPLAINT FOR DAMAGES

1  reckless or conscious disregard for the federally protected rights of Mr. HUNTER and constitute the

2  type of despicable conduct that no civilized society should be forced to endure. *Smith v. Wade,* 461

3  U.S. 30 (1983).

4      102.    By reason of the foregoing allegations, Plaintiff was required to retain counsel to

5  institute and prosecute this action and, by reason thereof, requests and is entitled to a reasonable sum

6  for attorney's fees pursuant to 42 U.S.C. §1988.

7  **<u>FIFTH CAUSE OF ACTION</u>**

8  **Conspiracy To Violate Civil Rights - 42 U.S.C. §1983**

9  **(Against HARDIMAN, HAGGERTY, and DOES 1-5)**

10      103.    The allegations contained in paragraphs 1-53 and 56-60 are incorporated herein by

11  reference as if set forth here in full.

12      104.    HARDIMAN, HAGGERTY, and DOEs 1-5 participated in a conspiracy with each

13  other to violate Mr. HUNTER's constitutional rights as alleged herein.

14      105.    Shortly after August 17, 2020, these defendants came to an agreement to violate Mr.

15  HUNTER's civil rights in order to build their so-called "phone-book" of evidence against him to

16  substantiate an arrest warrant.

17      106.    Each of the participants, the defendants herein, shared the common objective of the

18  conspiracy which was to violate Mr. HUNTER's constitutional rights in order to build a criminal case

19  against him.

20      107.    In furtherance of the conspiracy, HARDIMAN and HAGGERTY secretly recorded

21  Mr. HUNTER in two meetings without his knowledge or consent and attempted to somehow goad

22  him into admitting that he was hiding children or otherwise preventing them from being interviewed

23  by the defendants.  In doing, so HARDIMAN and HAGGERTY attempted to provoke Mr. HUNTER

24

28
COMPLAINT FOR DAMAGES

1   by aggressively accusing him, in front of prosecutors, of telling his clients not to produce the children

2   for interviews, and repeatedly asking him if he did such a thing.

3          108.     Each defendant acted individually and in concert with each other in violating Mr.

4   HUNTER's constitutionally protected rights; and are jointly and severally liable for the damages

5   demanded herein.

6          109.     Defendant COUNTY is vicariously liable for the wrongful acts of HARDIMAN and

7   HAGGERTY pursuant to section 815.2(a) of the California Gov't. Code which provides that a public

8   entity is liable for the injuries caused by its employees within the scope of employment if the

9   employee's act would subject him or her to liability.

10          110.     As a direct and proximate result of the aforesaid acts and omissions by defendants

11   HARDIMAN, HAGGERTY and DOES 1-5, Mr. HUNTER experienced great pain and suffering,

12   including emotional distress, shock, worry, humiliation, anguish, fright, confusion, anxiety,

13   nervousness, loss of enjoyment of life, inconvenience, embarrassment, apprehension, harm to

14   reputation, and other non-economic losses.  He also experienced loss of income and earning capacity

15   due to the effect the trauma of this ordeal had on his ability to perform in his profession as a zealous

16   advocate for his clients.  He incurred medical bills.  He was required to retain criminal defense

17   counsel at great expense and post a seven-figure bond.

18          111.     Exemplary and punitive damages are requested and warranted under 42 U.S.C. §1983

19   against HARDIMAN and HAGGERTY in their personal capacities because their conduct was

20   callous, willful, wanton, malicious, oppressive, and motivated by evil motive or intent or involved

21   reckless or conscious disregard for the federally protected rights of Mr. HUNTER and constitute the

22   type of despicable conduct that no civilized society should be forced to endure. *Smith v. Wade,* 461

23   U.S. 30 (1983).

24

COMPLAINT FOR DAMAGES

112.     By reason of the foregoing allegations, Plaintiff was required to retain counsel to institute and prosecute this action and, by reason thereof, requests and is entitled to a reasonable sum for attorney's fees pursuant to 42 U.S.C. §1988.

### SIXTH CAUSE OF ACTION

**Violation of Civil Rights 42 U.S.C. §1983 – *Monell* Claim**

**(Against COUNTY OF LOS ANGELES and DOES 6-10)**

113.     The allegations contained in paragraphs 1-53 and 56-60 are incorporated herein by reference as if set forth here in full.

114.     The conduct of defendants HARDIMAN and HAGGERTY and DOES 6-10 as alleged above led to deprivations of Plaintiff's constitutional rights, causing his wrongful arrest and incarceration.  They acted pursuant to an expressly adopted official policy or longstanding custom or practice of COUNTY and policymakers DOES 5-8.

115.     Plaintiff is informed and believes and thereupon alleges that, at all times herein mentioned, Defendant COUNTY and DOES 6-10, with deliberate indifference and conscious disregard to the safety, security, and constitutional and statutory rights of Plaintiff, engaged in the unconstitutional conduct which consists of the following customs and /or policies:

a.  the practice by LASD deputies including HARDIMAN and HAGGERTY of conducting so-called "listening" "Operations" consisting of secretly recording attorneys at public courthouse;

b.  the practice by LASD deputies including HARDIMAN and HAGGERTY of conducting so-called "listening" "Operations" consisting of secretly recording LASD inmates at public courthouses

c.  without their knowledge or consent

COMPLAINT FOR DAMAGES

d.  without the knowledge or authorization of court administrators or judges

e.  by wearing personal recording devices on their person or concealing a recording device while participating in meetings with attorneys and prosecutors and inmates

f. at the Compton Courthouse, by placing a microphone in the walkway between where the holding cells are and where the attorney/client meeting room is adjacent to Dept. D potentially capturing conversations between attorneys and their clients

g.  in violation of Penal Code 632 which prohibits eavesdropping using an electronic amplifying or recording device to listen in on another person's confidential communication

h.  in violation of Presiding Judge Kevin Brazile's Order dated January 11, 2019 implement the rules prohibiting anybody from recording inside of a courthouse without judicial permission.

i. in violation of Court Services Division Manual 2-08/020.05, Heading Audio Recording which prohibits recording of inmates in secured areas designated and marked as attorney rooms

j.  in violation of a LASD agreement with L.A. County Public Defender's Office that no recording devices were allowed in a lock up area of the criminal courthouse which was the result of prohibited recordings of inmates and their counsel in the Criminal Court's Building

k.  failing to adequately train and supervise its deputies in the authorized uses of this practice

l.  failing to adequately train and supervise its deputies to request authorization to record communications in the public courthouse and to obtain the consent of people to record their conversations

m.  failing to adequately discipline deputies involved in dishonesty or otherwise abusing their authority by engaging in these secret recordings

31

COMPLAINT FOR DAMAGES

n.  condoning and encouraging deputies in the belief they can violate the rights of persons

such as Plaintiff without impunity, and that such conduct will not adversely affect their

opportunities for promotion and employment benefits.

116.    HARDIMAN and HAGGERTY regularly conducted these secret Operations without

authorization at the public courthouse as was the custom and practice of the LASD, and thereby

violating the calmness and solemnity of the courtroom and blatantly disregarding rules and laws

against it.

117.    The "Operations" were the subject of motions to dismiss criminal complaints filed in

in the Compton Courthouse regarding several secret recordings of conversations in an area where

attorneys and inmate clients gathered.  At several hearings on those motions in August 2021,

HARDIMAN was cross-examined about the practice by attorneys whose clients' conversations were

captured on secret recordings and he acknowledged these "Operations" were authorized by LASD

including "Capt. Miranda."  He also admitted that he did not follow Judge Brazile's Court Order

described above.  He admitted he ignored the postings at the Compton Courthouse prohibiting any

recording in the courthouse without judicial approval. He admitted he ignored the Los Angeles

County court website prohibiting recordings of any kind in a courthouse in L.A. County without

judicial approval.  He admitted he was familiar with all three of those prohibitions.   He admitted he

did not receive any LASD or court authorization to record Mr. HUNTER in the jury room on August

31, 2020.  He admitted he told an attorney at a meeting in March 2021 that "maybe" he was recording

their meeting and if he wanted to record it he could because he was a cop, and did not have to

disclose it.  He admitted he was aware of the Sheriff's Manual provision prohibiting recordings in the

attorney/client room areas.  He was not aware of the LASD and Public Defender agreement not to

employ recording devices in lockup areas of the courthouse.

COMPLAINT FOR DAMAGES

118.     The Judge determined after these hearings the secret recording "Operations" were problematic and caused institutional harm in the sense that attorneys would be concerned about conducting meetings with their clients in attorney/client rooms for fear they were being recorded or a listening device was within close proximity to pick up the conversations.  The Judge also believed HARDIMAN should have obtained court-ordered approval to conduct his secret recording "Operations" and violated the various prohibitions against it including Rule 2.17 because it precluded the attorneys from accessing their clients, the services of the courthouse, and the facilities of the courthouse.

119.     The actions and inactions of the LASD, including HARDIMAN and HAGGERTY were known or should have been known to the COUNTY and policy makers responsible for the LASD and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise, or discipline in areas where the need for such training and supervision was obvious.

120.     The training policies of COUNTY were inadequate to train LASD deputies in the customs and practices detailed above.

121.     The final policymakers DOES 6-10 acted under color of law. They had final policymaking authority from defendant COUNTY concerning the acts and failures of the individual defendants.  On information and belief, these final policymakers ratified the acts of defendants HARDIMAN and HAGGERTY and DOES 1-5, that is, DOES 6-10 know of and specifically made a deliberate choice to approve these defendants' acts and failures to act.

122.     The actions and inactions of the LASD set forth herein caused and resulted in Mr. HUNTER's unlawful arrest without probable cause and incarceration, and/or are so closely related to

1  the deprivation of Mr. HUNTER's constitutional rights as to be the moving force that caused his

2  injuries as set forth herein.

3      123.    As a direct and proximate result of COUNTY's acts and omissions, condoning,

4  encouraging, ratifying, and deliberately ignoring the pattern and practice of HARDIMAN and

5  HAGGERTY's acts and omissions, Mr. HUNTER sustained injuries and damages including

6  emotional distress, shock, worry, fright, humiliation, anguish, confusion, anxiety, nervousness, loss of

7  enjoyment of life, inconvenience, embarrassment, apprehension, harm to reputation, and other non-

8  economic losses.  He also experienced loss of income and earning capacity due to the effect the

9  trauma of this ordeal had on his ability to perform in his profession.  He incurred medical bills.  He

10  was required to retain criminal defense counsel at great expense and post a seven-figure bond.

11      124.    Defendant COUNTY is liable for the damages to Mr. HUNTER as a result of their

12  unconstitutional custom and practices as described above.

13      125.    By reason of the foregoing allegations, Plaintiff was required to retain counsel to

14  institute and prosecute this action and, by reason thereof, requests and is entitled to a reasonable sum

15  for attorney's fees pursuant to 42 U.S.C. §1988.

16  **SEVENTH CAUSE OF ACTION**

17  **Civil Rights Violations 42 U.S.C. §1983 - Negligent Training and Supervision**

18  **(Against SHERIFF ALEX VILLANUEVA and DOES 7-10)**

19      126.    The allegations contained in paragraphs 1-53 and 56-60 are incorporated herein by

20  reference as if set forth here in full.

21      127.    The wrongful acts complained of herein caused a constitutional deprivation of the civil

22  rights of Mr. HUNTER as alleged herein, under color of state law, resulting in injury and damage to

23  Mr. HUNTER.

24

34

COMPLAINT FOR DAMAGES

128.    The wrongful acts alleged herein with respect to negligent training constitute a municipal custom or policy.

129.    Defendant VILLANUEVA failed to properly train and supervise LASD deputies including HARDIMAN and HAGGERTY and caused the wrongful arrest and incarceration of Mr. HUNTER.   As Sheriff, VILLANUEVA had a duty as chief policymaker of LASD to maintain and enforce policies regarding investigations of criminal charges by his subordinates, including the secret listening "Operations" program and ensure that innocent individuals are not wrongfully prosecuted based on these operations.

130.    VILLANUEVA set in motion and/or continued the secret listening Operations or knowingly refused to terminate these Operations that he knew or should have known would cause his subordinates including HARDIMAN and HAGGERTY to deprive persons of their constitutional rights.

131.    VILLANUEVA knew his subordinates including HARDIMAN and HAGGERTY were engaging in the actions described herein and knew or reasonably should have known that the officers' conduct would deprive persons like Plaintiff of his constitutional rights, and he failed to act to prevent his subordinates from engaging in such conduct.

132.    VILLANUEVA failed to properly train and supervise the actions of his subordinates in the conduct of the secret listening Operations and disregarded the known or obvious consequence that the failure to train would cause the officers to violate persons' constitutional rights including Plaintiff's; and this deficiency or omission actually caused them to deprive Plaintiff of his constitutional rights.

COMPLAINT FOR DAMAGES

133.    VILLANUEVA engaged in conduct that showed a reckless or callous indifference to the deprivation by the officers of the rights of others, and his conduct was so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the ultimate injury.

134.    As a direct and proximate result of VILLANUEVA's actions, Mr. HUNTER was injured and suffered damages for which VILLANUEVA is directly liable.

135.    As a direct and proximate result of VILLANUEVA's failure of training and supervision HARDIMAN and HAGGERTY's and other LASD deputies, Mr. HUNTER sustained injuries and damages including emotional distress, shock, worry, fright, humiliation, anguish, confusion, anxiety, nervousness, loss of enjoyment of life, inconvenience, embarrassment, apprehension, harm to reputation, and other non-economic losses.  He also experienced loss of income and earning capacity due to the effect the trauma of this ordeal had on his ability to perform in his profession.  He incurred medical bills.  He was required to retain criminal defense counsel at great expense and post a seven-figure bond.

136.    Defendant COUNTY is vicariously liable for the wrongful acts of VILLANUEVA pursuant to section 815.2(a) of the California Gov't. Code which provides that a public entity is liable for the injuries caused by its employees within the scope of employment if the employee's act would subject him or her to liability.

137.    By reason of the foregoing allegations, Plaintiff was required to retain counsel to institute and prosecute this action and, by reason thereof, requests and is entitled to a reasonable sum for attorney's fees pursuant to 42 U.S.C. §1988.

**WHEREFORE,** plaintiff prays for judgment as follows:

1.  For general and special/compensatory damages according to proof;

2.  For prejudgment interest from September 28, 2020, as allowed by law;

3.  For punitive and exemplary damages against all defendants except VILLANUEVA and COUNTY;

4.  For costs of suit incurred in this action;

5.  For attorney's fees as provided by 42 U.S.C. §1988;

6.  For such other and further relief as this Court deems just and proper

Dated:  September 27, 2022                    LAW OFFICES OF MILTON C. GRIMES

By: /s/ Milton C. Grimes
_____
Milton C. Grimes, Esq.
Claudia C. Bohorquez, Esq.
Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: September 27, 2022                    LAW OFFICES OF MILTON C. GRIMES

By: /s/ Milton C. Grimes
_____
Milton C. Grimes, Esq.
Attorney for Plaintiff

COMPLAINT FOR DAMAGES